## L. D. PARNELL V. STATE

No. 29,245. February 12, 1958.
Appellant's Motion for Rehearing Overruled
(Without Written Opinion) May 7, 1958.

*Sam B. Spence* and *Allen, Johnson & Cherry*, Wichita Falls, for appellant.

*L. T. Wilson*, District Attorney, *William N. Browning*, As-

240

sistant District Attorney, Wichita Falls, and *Leon Douglas,* State's Attorney, Austin, for the state.

WOODLEY, Judge.

The offense is abortion; the punishment, two years.

The state's theory, supported by its evidence, is that the 14-year-old Negro girl was taken to a Doctor Jackson by her grandmother. Dr. Jackson found that she was pregnant, and found no symptoms to indicate anything other than a normal pregnancy.

Before going to Dr. Jackson the girl had attempted to abort herself with a pen staff. After her examination by Dr. Jackson she took hot ginger, which she had heard would cause abortion.

She had no symptoms of sickness which would indicate that she would not have a normal delivery, except for some slight bleeding, which appellant himself testified did not necessarily mean anything and was not uncommon in pregnancy, and which Dr. Jackson testified did not show a resumption of menstrual periods.

The girl and her grandmother then went to appellant and asked him if he did such work as doing away with babies. He said he did not, but a lady did.

Appellant said the cost would be $180, told them to be quiet and to come back the next morning. No physical examination was made on this visit.

The next morning the girl and her grandmother returned to appellant's office and appellant made the same character of physical examination that Dr. Jackson had made, and told the girl to come back alone after office hours, which she did. He said nothing as to the result of his examination.

The girl returned at 5:45 and was told by appellant that the lady would be five or ten minutes late, and in about that time she appeared.

Appellant told the girl to pull off her pants and get on the table, which she did. The lady then put a rubber tube or catheter and some cotton or gauze into her private parts, while appellant "just sat around." After a while appellant told her that she

could go and instructed her to be back the next day. She did not know when the tube was taken out.

On the occasion just mentioned no one was in the room except appellant, the lady (who it appears was the defense witness, Mrs. Bailey) and the girl.

Returning the following day appellant, assisted by Margaret Bryant, Eva Smith and Charlotte Whitley, his employees, performed "a curettement" or "D.C." and removed dead fetuses from the girl's womb.

Dr. Jackson testified that an abortion could be caused by the insertion of a rubber catheter into the womb so as to rupture the membrane which formed the sac holding the fetus.

The defense theory, supported by the testimony of the appellant and Mrs. Bailey, was that the girl was having difficulty and came to him for help; that he had her come back the next day because he was busy with other patients; that on her second visit he made an inspection, but did not have time and help to complete an examination and that when she came back that afternoon, after five, he completed his examination with the assistance of Mrs. Bailey, who inserted a catheter to drain her bladder and to secure a specimen of urine for examination.

Appellant and Mrs. Bailey denied that the catheter was inserted for the purpose of causing an abortion but both admitted that it was inserted.

The facts as to the removal of the dead fetus or twin fetuses the following day are not in material dispute. The real issue was whether the life of the fetus was destroyed by the insertion of the catheter the day before, or was due to other causes, such as the use by the girl of a pen staff and of hot ginger, or to syphilis, or other causes.

There is, however, testimony supporting the defense theory that the fetus which appellant removed had been dead for some time. Appellant said there was a tremendous odor. However, his former employee testifying for the state, when asked about a "rather offensive odor," said "Well, you didn't notice the odor too bad, no."

Appellant's evidence also made issue as to whether the

catheter was inserted with the design to destroy the life of the fetus or embryo, or was inserted to drain the bladder.

On this issue Mrs. Bailey testified that she inserted the catheter to drain the bladder, but on cross examination said that the catheter was inserted to a depth of some five to six inches from the opening into the uretha.

Dr. Collins and Dr. Rosenblatt, state witnesses, testified that the distance from the opening of the uretha to the bladder was from a half inch to an inch and a half.

In rebuttal, the state was permitted to prove and did prove that abortions were performed by appellant in the same manner, by the use of a catheter, upon two other females, each going to him for that purpose, and each returning for the final "curettement," and each cautioned to remain silent.

The jury rejected appellant's explanation and defense, and we are called upon to determine three controlling questions: (1) Did the court err in refusing to charge upon the law of circumstantial evidence? (2) Is the evidence, viewed from the standpoint most favorable to the state, sufficient to sustain the conviction? And (3)) did the court err in permitting the state to prove the two prior extraneous offenses, limiting such evidence in the charge to the purpose of showing the intent and system of the appellant as to the particular offense charged?

On the first issue, appellant urges that there is no direct proof that the fetus was alive in the womb of the girl when she was first examined by him.

The testimony of Dr. Jackson, that there was no evidence of other than a normal pregnancy in the early stages (8 weeks), together with the known fact of nature that the pregnancy, in the absence of an intervening cause, would continue and progress, is direct evidence that the fetus lived and progressed. Jordan v. State, 130 Texas Cr. Rep. 182, 92 S.W. 2d 1024.

There was no intervening cause under the state's theory, after Dr. Jackson's examination, unless it be the taking of hot ginger. Dr. Jackson had heard of no such method of abortion and there was no testimony that such would have any deleterious effect upon pregnancy. The girl had learned that she was pregnant, had been examined by Dr. Jackson who found no reason to ex-

pect other than a normal pregnancy and delivery. She was having no pain or trouble when she went to appellant for an abortion.

The evidence is direct, and viewed in the light most favorable to the jury's verdict, shows appellant's guilt as principal and is sufficient to sustain the conviction.

The testimony offered by the state in rebuttal, showing that two other women had gone to appellant for an abortion and had been relieved of their pregnancy by appellant and a lady by the insertion of a catheter and a curettement the following day, was admissible. This is so because the defense had made issue and attempted to defeat the testimony of the state by the claim that the girl came for treatment and not for an unlawful abortion; was examined but her pregnancy not interferred with by Mrs. Bailey; that the catheter was inserted to drain her bladder and obtain a urine specimen, and not to take the life of the fetus; and that the last operation was to remove a dead fetus, the girl's own act or because she had syphilis, or for some cause other than the insertion of the catheter.

Commission of other crimes may be shown where the intent becomes an issue, such as where it is claimed that the act in question was free from a criminal intent. 18 Texas Jur. 68.

In order to prove purpose or design, evidence showing system is relevant and isolated offenses are admissible from which system may be inferred. Wharton's Criminal Evidence, 12th Ed., Sec. 237.

We see no material difference between the defense here raised and "innocent intent" referred to in Gray v. State, 77 Texas Cr. Rep. 221, 178 S.W. 337.

It is not, as appellant contends, a question of whether appellant in the last operation which he performed assisted by his staff of three ladies, removed a dead fetus or twin fetuses, but whether the insertion of the catheter the evening before was made with the purpose and intent of taking the life of the fetus and did so, as contended by the state, or whether on the other hand appellant did not agree and intend to abort the girl with a catheter and did not take the life of the fetus or fetuses he removed the following day by insertion of a catheter.

In other words, the defense was that not only the insertion

of the catheter but the entire proceedings were lawful and with innocent intent to treat the girl and not with intent to perform a criminal abortion upon her.

Evidence that, under similar circumstances, he had agreed to and did abort other pregnant women in the same manner and by the same method was admissible upon this issue of intent.

The court did not err in admitting the evidence mentioned, and limiting it in his charge to system and intent.

The judgment is affirmed.

DAVIDSON, Judge, dissenting.

Being unable to agree that this conviction should be affirmed, I respectfully record my dissent.

Clemmie Johnson, a fifteen-year-old Negro high school girl, discovered that she was pregnant as the result of repeated acts of intercourse with two different boys. She admitted that she attempted to destroy her pregnancy by piercing her privates with a pen and penstaff. Her pregnancy having been made known to her grandmother, the two, together with others, went to the office of Dr. Jackson for an examination of the prosecutrix. Dr. Jackson made the examination and found her to be approximately eight weeks pregnant. The examination was made on May 7, 1956.

On May 24th and 25th, in an endeavor to destroy her pregnancy by another means, the prosecutrix drank ginger in hot water, which she had heard would bring about that result. The next day she started bleeding from her privates and used a sanitary napkin, upon which blood stains were shown for a period of three days.

About eleven days thereafter, on June 5th, prosecutrix, accompanied by her grandmother, went to the office of the appellant. The grandmother asked him "if he would do such work as doing away with babies," to which inquiry appellant replied that he did not but that "a lady did." The matter of "doing away with" a baby was discussed, and appellant "said it would cost $180.00" and that it would be necessary that they "just be quiet" about the matter. Appellant made no examination of the prosecuting witness at that time, and she was directed to return the following morning.

The next morning the prosecutrix and her grandmother appeared at the office of the appellant, as directed. At that time, appellant did make an examination of the prosecutrix. He did not advise his findings but directed that she return by herself about 5:45 o'clock. She returned at that time alone. Appellant advised her that the "lady would be five or ten minutes late." The woman arrived shortly thereafter.

Prosecutrix was told to remove her panties and get on a table and prop up her legs. This she did, and the woman inserted and packed into her privates with cotton a rubber tube or catheter. Apellant did not actively participate in what was done but was in and out of the room during the procedure. The prosecutrix was on the table five or ten minutes. When she left, the appellant directed her to return the next day at noon.

When the prosecutrix returned the next day she was placed upon the same table and given a hypodermic, from the the effects of which she fell asleep. She recalled that before going to sleep the appellant and three nurses were in the room and that "they started getting pans and gloves and all sorts of things together." When the prosecutrix awakened she went into another room, where she lay down and slept until the next morning. She then went home in a cab.

About two days thereafter, prosecutrix returned to the office of the appellant. A blood test was made which showed syphilis, for which she received shots daily for fourteen days. She was then advised that she was cured.

The prosecutrix exhibited receipts showing payment to appellant of various amounts of money for his services.

Margaret Bryant, one of the nurses who was present and assisted the appellant, described the operation performed upon the prosecutrix as a curettement in the course of which the appellant removed from the womb of the prosecutrix two dead fetuses.

Dr. Jackson, whom the prosecutrix first visited, testified that she was eight weeks advanced in pregnancy when he examined her. He found nothing to indicate that any complications existed or would arise in the course of pregnancy. Upon his direct examination by the state the witness testified that a catheter would not ordinarily be used in producing an abortion—that is, a lawful abortion. Upon re-direct examination he expressed the opin-

ion that an abortion could be caused by the insertion of a rubber catheter into the womb and breaking the membrane of the sac in which the fetus was enclosed.

It is upon the above testimony that this conviction depends.

The following is appellant's defense, supported by his own and other testimony:

The grandmother of the prosecutrix arranged with him to make a complete examination of the prosecutrix. During that examination the prosecutrix desired to urinate and a catheter was used to drain her bladder, thereby making it unnecessary for her to leave the examination table. In the course of the examination appellant came to the conclusion that from the condition in which he found the prosecutrix she was not only pregnant but that the fetus was dead. He entertained the view that she might expel the fetus, herself, during the night and for that reason, after placing cotton packs in the vagina to prevent infection, he sent her home with instructions to return the next day if she did not lose the baby before that time. Prosecutrix returned the next day, at which time appellant removed from her a fetus which had been dead such length of time that it gave off a tremendously offensive odor. Appellant insisted that the money paid to him by the prosecutrix was for that service.

It is insisted by appellant that, under the facts, he was entitled to have the jury instructed upon the law of circumstantial evidence and that the trial court erred in failing and refusing to do so.

In this case the indictment alleged that the appellant committed the abortion by use and means of a rubber catheter, by thrusting and forcing "into the womb and private parts of the said Clemmie Johnson, a rubber tube calculated to produce abortion, and did then and there destroy the life of the fetus, or embryo in the womb of the said Clemmie Johnson."

As to the means used, this allegation was descriptive of the offense charged and was required to be established in order to convict. King v. State, 35 Texas Cr. Rep. 472, 34 S.W. 2d 282.

The trial court so instructed the jury and required, in order to convict, a finding that the life of the fetus or embryo was destroyed by the use of a rubber tube.

In an abortion case the main fact to be proven is the destruction of the life of the fetus or embryo in the woman's womb or the bringing about of a premature birth. Art. 1191, P.C.; Mayberry v. State, 160 Texas Cr. Rep. 432, 271 S.W. 2d 635.

As applied to this case, then, the state was required to prove that the appellant, by himself or aiding another as a principal, destroyed the life of a fetus in the womb of Clemmie Johnson by the use of a rubber tube.

Where the main fact in the case is proven as a matter of inference from other facts, the case rests solely upon circumstantial evidence.

There is no direct testimony that the fetus was alive in the womb of Clemmie Johnson when she went to the appellant. That it was then alive is only to be deduced from the fact that it was alive when Dr. Jackson saw and examined the prosecutrix about a month earlier. So then, proof that the fetus was alive when the prosecutrix was attended by appellant rests alone upon the inference that it was alive a month prior thereto. This inference must be indulged, notwithstanding the fact that the prosecutrix had a menstrual flow and passed blood from her privates for three days after drinking hot ginger. The last appearance of blood had stopped only about a week prior to her visit to and examination by the appellant.

Moreover, attention is called to the fact that when removed by the appellant the fetus had been dead sufficiently long to have a very offensive odor. In that connection, the undisputed evidence shows that slightly over twenty-four hours had elapsed from the time appellant first saw the prosecutrix until he removed the fetus—which fact would indicate that the fetus was dead before the appellant ever saw or attended the prosecutrix. So much as to the proof showing destruction of a live fetus!

All parties agree that a rubber tube or catheter, as well as cotton, was placed by the nurse into the privates of the prosecutrix.

In this connection, all the prosecutrix said was that the tube was placed in her privates; she did not know which nurse placed it therein; and she did not know how long it remained as she did not know when it was removed. Whatever was done consumed only about five minutes. She knew that she did not remove

the catheter, herself, and that she did not see or feel it when she reached home.

In connection with that testimony and the burden resting upon the state to prove that the life of the fetus was destroyed by the rubber tube, it is well to remember that the state's witness, Dr. Jackson, testified that, while an abortion might be produced by a rubber tube, such was not the method used by the medical profession to accomplish that result.

It is apparent that there is no direct testimony showing that the life of the fetus was destroyed by using a rubber tube. It is only by inference that it can be said that a rubber tube was placed in the womb of the prosecutrix and life destroyed in the fetus thereafter found in her womb.

From what has been said it is apparent that the state's case depends solely upon circumstantial evidence and that the trial court fell into error in not instructing the jury upon the law relative thereto.

There is another reason why a charge on circumstantial evidence was necessary under the facts of this case.

All the testimony both for the state and the appellant shows that the catheter or rubber tube was inserted into the privates of the female by the nurse, Mrs. Bailey. There was no evidence nor suggestion from any source that the appellant inserted the catheter. Appellant's guilt, then, must depend upon an application of the law of principals.

The trial court recognized that the law of principals was applicable under the facts and gave the following charge:

"All persons are principals who are guilty of acting together in the commission of an offense. When an offense is actually committed by one or more persons but others are present, and, knowing the unlawful intent, aid by acts or encourage by words or gestures those actually engaged in the commission of the unlawful act, such persons so aiding or encouraging are principal offenders, and may be prosecuted as such."

The charge follows Art. 66, P.C.

It will be noted, however, that the trial court made no appli-

cation of that law to the facts. He was not requested to do so, nor was an exception reserved to his failure to so do.

For appellant to be guilty as a principal under Art. 66, P.C., these facts must be established: that appellant was present and knew that Mrs. Bailey intended to produce an abortion when she inserted the catheter into the privates of the prosecutrix; and that, knowing Mrs. Bailey's unlawful intent, appellant aided her in the commission of the abortion. Mowrey v. State, 132 Texas Cr. Rep. 408, 105 S.W. 2d 239.

The failure of the trial court to require an express finding by the jury in order to convict by no means renders unnecessary a charge on circumstantial evidence when such facts are made to depend upon circumstantial evidence.

There is no testimony that Mrs. Bailey intended to produce an abortion. The rubber tube or catheter was not such an instrument as was commonly used or calculated to produce that result. Hence the unlawful intent on the part of Mrs. Bailey could not be inferred solely from the use of the catheter.

Such being true, the unlawful act on the part of Mrs. Bailey is demonstrated to be dependent upon circumstantial evidence.

It follows, then, that as appellant's guilt depended upon circumstantial evidence that issue should have been appropriately submitted to the jury.

The same facts and reasoning which demonstrate the necessity of a charge on circumstantial evidence also demonstrate the insufficiency of the evidence to support the conviction.

Appellant's guilt is made to depend upon the guilt of Mrs. Bailey because, knowing her unlawful intent, he aided and encouraged her in the commission of the abortion. If Mrs. Bailey was not guilty of the abortion, neither would the appellant be guilty. So then for appellant to be guilty, the facts must show the guilt of Mrs. Bailey.

When the facts are examined for that purpose we find that there is not a line of testimony that Mrs. Bailey knew the prosecutrix was pregnant or had ever seen her prior to the time she inserted the catheter into the privates of the prosecutrix. There is, then, an entire absnce of any proof that Mrs. Bailey "wilfully, and designedly" produced an abortion on the prosecuting witness

—which fact is necessary to be established to show the commission of the crime of abortion.

The state having alleged that the abortion was produced by the insertion of the catheter into the privates of the prosecuting witness and all the evidence showing that appellant at no time inserted the catheter into her privates, appellant can be guilty only when shown to be a principal to the commission of the crime of abortion by Mrs. Bailey. This the facts fail to show.

I come now to a discussion of the admission of evidence that appellant committed an abortion on two other women, one of which occurred about three months prior to and the other about four months subsequent to the commission of the offense here charged. In each instance the woman was permitted to testify to the details of the abortion which, in each case, was performed by the insertion of a catheter in her privates and some days thereafter appellant performed an operation on her privates, after which she was no longer pregnant.

This testimony depicted appellant as an abortionist, generally, in the performance of which he followed the same technique as used in the instant case.

The damaging and prejudicial effect of that testimony cannot be denied. If it was not admissible, a reversal of the conviction would be mandatory.

In his charge the trial court expressly limited to the jury's consideration "the intent and system of the defendant as to the patricular act charged in the indictment, if it does do so, and for no other purpose."

There is no question, then, but that the testimony was admitted because it tended to show the intent and system of the appellant and for no other reason. The admissibility of the testimony must be tested from that standpoint and no other.

When appellant was indicted in this case and when he was called for trial it was to answer the accusation presented and charged in the indictment. There was nothing there to indicate that when he was placed on trial to answer the accusation he would at that time also be called upon to defend himself against having committed an abortion on a woman other than the prosecutrix, here, three months before and also on still another and different woman four months after the indictment in this case

was returned. Yet that is exactly what appellant was called upon to do upon the instant trial.

If appellant failed to prove himself innocent of those abortions, the jury was authorized to consider those crimes for the purpose of showing his intent and the system used in effecting the abortion for which he was on trial.

If the right of trial by jury as guaranteed by our Constitutions means anything at all it means that one charged with crime is entitled to know the offense with which he is charged and to be tried for that crime and no other. In keeping with that guarantee the courts have zealously guarded against admitting proof of other and extraneous offenses and have permitted proof thereof only when they go to show intent, identity, or system, or are a part of the res gestae. Branch's P.C., 2d Edition, Vol. 1, Sec. 188. The authorities there cited are in one accord with the proposition that if the state's testimony, if believed, leaves no question as to the intent or identity, proof of other offenses will not be received, because they show intent or identity. It is a correct rule of law that there must be some issue under the evidence adduced at the trial as to the intent or identity of the accused before proof of other and extraneous offenses becomes admissible.

Among the cases from this court which, in my opinion, stand out are Gray v. State, 77 Texas Cr. Rep. 221, 178 S.W. 337, and Daniel v. State, 152 Texas Cr. Rep. 241, 212 S.W. 2d 637.

In the Gray case this court said:

"On the other hand, it seems to be the well-settled rule in this state, when evidence adduced on the trial leaves no question as to the intent of the accused in doing the act complained of, proof of other offenses, even though of similar character and kind, is not admissible on the issue of intent."

In the Daniel case, where theft was the offense charged, the state, in the development of its case, proved by the witness White that the accused attempted to swindle a person other than the prosecuting witness at another time and place. It was held that White's testimony was inadmissible, and as a reason for that holding this court said:

"To approve the admission of the evidence of the White transaction would commit this court to the proposition that if an accused is on trial for assault with intent to murder A. and

accused by evidence tenders no issue of an innocent intent, and in no way by evidence controverts the State's case, the State may nevertheless put in evidence the fact that accused also assaulted B. with intent to kill him, and likewise C. and D., although the transactions are not res gestae of the one on trial, and have no apparent conection with each other. *And so with every other offense where intent is an element.* (Emphasis, supplied.)

"This is unthinkable, and contrary to the principle that an accused be tried on the merits of the case then before the court."

That statement has a direct and peculiar application here.

It is the rule that proof of other offenses, in order to show the intent of the accused, will be permitted only when there is an issue under the evidence as to that intent. Conversely, then, if there be no issue under the facts, proof of other offenses will not be received, because they show the intent of the accused.

I submit that this record will be searched in vain for any testimony which shows or tends to show any issue of intent. All that the appellant did, as shown by his testimony and that of Mrs. Bailey, was to deny that any act on their part killed the fetus in the prosecuting witness—which act the state relied upon to show an abortion. Nor did the appellant admit that the insertion of the catheter destroyed the fetus; he explained that what was done was with an innocent intent.

The entire defense was a denial of the state's incriminatory testimony. This did not raise any issue of intent on appellant's part.

What was said in the Daniel case is applicable: Proof of the other crimes is and would be contrary to the principle that one accused of crime must be tried on the merits of the case then before the court.

The trial court said that proof of the other abortions was admissible as showing system.

I am unable to understand this viewpoint of the trial court. In sustaining the trial court's holding, my brethren make no effort to point out wherein the proof is admissible. If the term "system" was used as synonymous with intent, then what I have said relative to the proof as showing intent is applicable here. On the other hand, if the word "system" was not used as show-

ing intent it could be used but for one other purpose, which would be to identify the appellant as the guilty party. It must be remembered that the fact that two or more distinct crimes may have been committed the same way does not show system. Long v. State, 39 Texas Cr. Rep. 546, 47 S.W. 363; Smith v. State, 52 Texas Cr. Rep. 80, 105 S.W. 501; Missouri v. State, 109 Texas Cr. Rep. 193, 4 S.W. 2d 68.

Proof showing the commission of systematic crimes by the accused does not show system. Walker v. State, 103 Texas Cr. Rep. 555, 281 S.W. 1070. In that case the state's case showed that the accused was guilty of rape by assault, and other persons were permitted to testify that the accused had assaulted them in the same manner. It was held that such testimony was not admissible, especially as showing system. The rule there announced is strikingly applicable here.

In Mayes v. State, 118 Texas Cr. Rep. 612, 42 S.W. 2d 65, this court held that similarity of transactions and proximity of time thereof do not of themselves constitute system so as to render testimony concerning other offenses admissible.

Lawrence v. State, 128 Texas Cr. Rep. 416, 82 S.W. 2d 647, is, to my mind, the outstanding case by this court touching proof of other offenses under the rule of system. In that case Lawrence was on trial for the killing of a young man found hunting ducks on his ranch, by shooting him with a rifle. The identity of the appellant as the person who fired the shot was not shown by any direct testimony; his identity was made to depend entirely upon circumstantial evidence. The state took the position that the appellant entertained malice against all persons found hunting ducks on his ranch, and introduced evidence showing that he had shot at three other persons found hunting ducks there under like circumstances and conditions as when he killed the deceased.

By an opinion in which the question was discussed at length and in the light of prior holdings, this court held inadmissible the testimony as to the shooting of the other hunters.

A reference to Shepard's Citation will reveal the number of times the Lawrence case has been cited. It has not been overruled or modified. If there is one pronouncement in the case which conclusively controls this case it is that proof of other offenses as constituting system may be shown for the purpose of identifying the accused as the guilty person. That means, then, nothing more or less than that if the identity of the accused is known or

established by direct testimony proof of system has no application. It also means that proof of system can arise or be authorized only in circumstantial evidence cases. So long as there exists any question as to the identity of the accused, the case is one of circumstantial evidence.

It is my conclusion, then, that proof of the commission by appellant of the other abortions was not admissible as proof of system. The incompatible and irreconcilable position which my brethren take is apparent. If this was not a case of circumstantial evidence and no charge thereon was required, as they hold, then there was no issue as to the identity of the appellant as the guilty party, and therefore, the essential element authorizing proof of system is absent. On the other hand, if proof of the other abortions was admissible because of system, as the majority opinion holds, it is because the case was one of circumstantial evidence and the trial court should have instructed the jury thereon.

My brethren find themselves in this position: They say, first, that the case was not one involving circumstantial evidence and that the trial court did not err in failing to instruct the jury thereon. Then in the face of that holding they say that proof of other offenses was admissible because it showed system identifying the appellant as the guilty party, which could arise only in a circumstantial evidence case.

Both positions cannot be true, or exist. The holding is therefore both irreconcilable and incompatible.

Irrespective of all things else, the evidence showing the commission by appellant of the crime of abortion four months after the commission of the offense for which he was then on trial was not admissible under any circumstance or for any reason.

I can conceive of no reason, real or fanciful, whereby it may be said that one's intent in committing an act today is controlled or may be ascertained from or shown by what he does four days, four weeks, four months, or four years subsequent thereto, in a wholly unrelated case involving different persons.

Yet that is exactly what my brethren hold, here, when they say that the testimony showing that appellant committed an abortion upon a different person, four months after he was alleged to have committed the abortion for which he was here

on trial, was admissible as showing the intent with which he acted four months prior thereto.

I have always understood that the intent with which one acts is ordinarily to be ascertained from what he does at the time of and under the circumstances surrounding the commission of the act.

So if intent is to be ascertained from the acts done at the time, it necessarily follows that what one does subsequently thereto can not be utilized for that purpose. Yet that is what my brethren do, here.

The bridle which for all these years has served to prevent the state from trying one for being a criminal, generally, has now been removed. The state has now been given the green light to prove against one upon trial all the other crimes and offenses he has or may have committed before, at the time of, or subsequent to the date of the offense for which he is hailed into court to answer and stand trial.

Proof of such other crimes is allowed to remain with the jury with the admonition from the trial court that they can consider such testimony for the purpose of determining "the intent and system of the defendant as to the particular act charged in the indictment, if it does do so."

Nowhere are the jury told what intent or system is. The jury are thus at liberty to consider proof of the other crimes for any purpose they please to say is intent or system.

A man's liberty ought not to be taken from him under such circumstances.

A reversal of this case is demanded under the record. To its affirmance I reiterate my protest.