BEN JACK CAGE V. STATE.

No. 29,751. May 28, 1958.
Motion for Rehearing Overruled January 28, 1959.
Second Motion for Rehearing Overruled February 11, 1959.

*Ivan Irwin, Pete White, M. R. Irion,* Dallas, and *King C. Haynie* (on appeal) Houston, for appellant.

*Henry Wade,* Criminal District Attorney, *James K. Allen,* First Assistant District Attorney, *Wm. F. Alexander, A. D. Jim Bowie, James Williamson,* Assistants District Attorney, Dallas, and *Leon Douglas,* State's Attorney, Austin, for the state.

DICE, Judge.

The conviction is for embezzlement of money of the value of fifty dollars or over; the punishment, 10 years confinement in the penitentiary.

The state's evidence shows that appellant was vice-president of the ICH Corporation, a corporation chartered under the laws of The State of Texas, with its principal place of business in the city of Dallas, Dallas County, Texas. The original corporate name of the corporation was ICT Discount Corporation which was later, by charter amendment, changed to ICT Corporation. ICT Corporation together with ICT Life Insurance Company and ICT Insurance Company of Texas was managed by Jack Cage and Co., of which appellant was president and principal stockholder.

Francis J. Knoll, Secretary of the ICT Corporation, upon being called as a witness by the state, testified that on June 22,

1955, a draft in the amount of $100,000.00 addressed to appellant and payable to Missouri Union Corporation was received for payment at the Mercantile National Bank in Dallas; that on such date appellant called by telephone and advised him of the draft and told him to pay the same from funds of ICT Corporation; and pursuant to appellant's instructions he paid the draft by issuing and delivering an ICT Corporation check in the amount of $100,000.00 to the Mercantile National Bank on the account of the corporation in that bank which check was signed by him as secretary and his assistant as co-signer. That by virtue of a bank resolution on file the officers of ICT Corporation were authorized to sign checks on the corporation and by virtue of their offices in the corporation both he and the appellant had care, custody, possession and control of the money belonging to the corporation in the Mercantile National Bank in Dallas. The witness further testified that after the $100,000.00 disbursement, the item was carried on the books of ICT Corporation as an account receivable from Missouri Union Corporation; that the item was not considered as a loan and no payment was received of the account up to the time he left the company in Feburary, 1956.

Edmond B. Welshans, President of Missouri Union Corporation, called as a witness by the state, testified that upon receipt of the $100,000.00 from the draft drawn on appellant, Missouri Union Corporation issued 20,000 shares of stock to three nominees of appellant; that upon receipt of the money and issuance of the stock the transaction was completed and Missouri Union Corporation did not owe ICT Corporation as a result of the transaction. He further testified that shortly after the $100,-000.00 was deposited to the account of Missouri Union Corporation, in a bank in Kansas City, Missouri, the appellant, who was chairman of the Board of Missouri Union Corporation, withdrew $96,000.00 from the account by signing a check on the corporation; that when the transaction was discovered and called to his attention appellant advised that the withdrawal had been made in the name of the corporation as an investment; that later the sum was secured by a note in the amount of $100,000.00 executed by the Oxford Corporation and a collaterial pledge agreement executed by appellant whereby the 20,000 shares of stock which had been issued by Missouri Union Corporation to appellant's nominees were pledged as collateral security for payment of the note and that the 20,000 shares of stock were thereafter acquired by Missouri Union Corporation in cancellation of the balance due on the note.

Paul C. Sparks, a director of the ICT Corporation and member of the investment committee, testified that he had no knowledge of the $100,000.00 disbursement of ICT funds in payment of the draft drawn on the appellant and that it was made without his permission and consent.

Appellant did not testify but through his interrogation of the state's witnesses and exhibits introduced in evidence sought to show that the purpose of the $100,000.00 disbursement was to loan the money to Missouri Union Corporation to form an insurance company in Missouri which would enter into a re-insurance treaty with the ICT Insurance Company to take over the company's business in Missouri. It was shown by appellant that in the transactions between the ICT group in Texas and the Missouri Union Corporation the sum of $420,000.00 was loaned by ICT Corporation to Missouri Union Corporation; however, the evidence shows that the loan was approved by the directors of ICT Corporation, a note and collateral security was given therefor and the loan was paid without reference to the $100,00.00 disbursement. Appellant also sought to show that the $100,000.00 item carried on the books of the ICT Corporation as an account receivable from Missouri Union Corporation was paid and settled on July 1, 1956, under the terms of an exchange agreement between ICT Corporation and Jack Cage and Company and evidence was offered by the State which showed that ICT Corporation lost $1,044,984.35 by virtue of the contract of exchange.

Appellant also attempted to show that the $100,000.00 transaction with Missouri Union Corporation was for the benefit of ICT Corporation and all the corporations in the ICT group and that he had no intent to defraud ICT Corporation in the transaction.

We shall discuss the contention of appellant in the order presented in his brief and oral argument.

Appellant first insists that the court erred in permitting the state to introduce in evidence 16 checks issued by ICT Corporation to J. B. Saunders, a member of the Insurance Commission of Texas, because they were not shown to be other embezzlements, or offenses of which appellant was guilty, or transactions connected with, or relevant to, the offense charged.

The record reflects that the checks were admitted in evidence by the court on the issue of appellant's intent after the witness,

Knoll, had testified that they were issued to Saunders upon instructions of appellant for, according to the appellant, legal services rendered to ICT Corporation. Knoll testified that while Saunders could have rendered legal services to the corporation he knew of none rendered by him.

The general rule which prohibits evidence of extraneous offenses has certain well recognized exceptions. Under the exceptions to the rule, evidence of extraneous offenses or transactions is admissible where it shows system, intent, knowledge, identity, etc. Crutchfield v. State, 144 Texas Cr. Rep. 291, 162 S.W. 2d 699; Lawson v. State, 148 Texas Cr. Rep. 140, 185 S.W. 2d 439 and Campbell v. State, 163 Texas Cr. Rep. 545, 294 S.W. 2d 125. Under such exceptions to the rule evidence of similar transactions becomes admissible even though it does not show the commission of other offenses. Stanford v. State, 103 Texas Cr. Rep. 182, 280 S.W. 796 and Rose v. State, 148 Texas Cr. Rep. 82, 184 S.W. 2d 617.

The issuance of the checks to Saunders under appellant's directions were similar transactions to that of the issuance of the $100,000.00 check in question in that company funds were being disbursed at appellant's direction. If Saunders was performing no legal services to the corporation the company was being defrauded as a result of the issuance of the checks under appellant's directions. Under the record the court did not err in admitting the checks in evidence on the issue of appellant's intent in the $100,000.00 transaction in question.

Appellant next insists that the court erred in requiring the witness J. Byron Saunders to assert in the presence of the jury his privilege of immunity from testifying. Appellant's contention is presented by Formal Bill of Exception No. 3 which, as originally presented to the court, certified that the witness Saunders prior to taking the witness stand advised state's counsel that he intended to claim his privilege, that counsel for appellant so advised the court and requested that the matter be determined out of the hearing and presence of the jury but the court ruled the matters were admissible before the jury. The bill of exception is approved by the court with the qualification that "Any matter of act or recitation of testimony set forth in the Bill which are at variance from the facts shown in the official record in this case as prepared by the court clerk and the court reporter are not certified by me as true, but are certified by me as being contention of the defendant." A reference to the statement of facts shows that the only reason given by the court by

appellant for his request that the witness, Saunders, be examined outside the presence and hearing of the jury was "He's an attorney, member of the Bar, lawyer just like you are." The fact that the witness Saunders was an attorney constituted no legal ground or reason why he should not be examined in the presence and hearing of the jury. Under the record the bill of exception, as qualified, does not reflect error.

The court, in his charge, limited the jury's consideration of the evidence introduced concerning the checks issued to J. B. Saunders by instructing the jury that such evidence was admitted to aid them in determining the intent of appellant and for no other purpose and that they could not consider such evidence in determining his guilt or innocence but only in determining his intent and design.

Appellant insists that the charge as given by the court was erroneous for various reasons. He first contends that it was erroneous because of the use of the term "and/or" in the instruction. That the instruction was not supported by the evidence and was an unwarranted comment by the court because it referred to checks issued by ICT Insurance Company rather than ICT Corporation as shown by the evidence. Appellant further insists that the charge was erroneous because it failed to instruct the jury that before they could consider the extraneous transactions they must believe beyond a reasonable doubt that appellant was guilty thereof.

Appellant objected to the charge in the trial court in the following language:

"for the reason that same is not supported by the evidence and same being wrongfully introduced in evidence and not meeting the requisite of the law regarding extraneous transactions. The Charge of the Court thereon constitutes an unwarranted comment by the Court of the evidence in this cause."

Article 658, V.A.C.C.P., provides that before a charge is read to the jury the defendant or his counsel shall have a reasonable time to examine the same and he shall present his objections thereto in writing "specifying each ground of objection." Under the provisions of this statute objections to a court's charge which do not specifically point out the error complained of will not be considered. Dozier v. State, 143 Texas Cr. Rep. 397, 158 S.W. 2d 776, and Matterson v. State, 146 Texas Cr. Rep. 621, 177 S.W. 2d 791.

Appellant's objection to the charge that it constituted "an unwarranted comment by the Court of the evidence" and did "not meet the requirements of the law regarding extraneous transactions" constituted a general objection to the charge and did not specifically point out to the court any error therein as required by Art. 658, supra, therefore, appellant's complaints to the charge are not properly presented for review. Gill v. State, 84 Texas Cr. Rep. 531, 208 S.W. 926; Lucas v. State, 88 Texas Cr. Rep. 166, 225 S.W. 257; Parsons v. State, 102 Texas Cr. Rep. 524, 278 S.W. 444 and Soto v. State, 161 Texas Cr. Rep. 239, 275 S.W. 2d 812.

The court's refusal to give the appellant's requested charge which would have instructed the jury to acquit appellant if they believed or had a reasonable doubt that he withdrew the $100,-000.00 or caused the same to be withdrawn under a claim of right, was not error as the issue of appellant taking the money under a claim of right was not raised by the evidence.

Appellant insists that the court erred in permitting the state's witness Knoll to testify that the permit of a foreign corporation, Guardian Insurance Company of South Dakota, to do business in Texas was back-dated over the objection that such testimony was irrelevant, immaterial and the records would be the best evidence. The record reflects that the witness gave such testimony on redirect examination after appellant had brought out on cross-examination of the witness that through various re-insurance treaties between ICT Insurance Company and certain foreign corporations, the reserve of ICT Insurance Company would be benefited which in turn was for the benefit of ICT Corporation and that such was the purpose of the $100,-000.00 disbursement upon which he was being prosecuted. In view of the testimony elicited by appellant relative to the re-insurance treaties between ICT Insurance Company and various foreign corporations the testimony complained of was not subject to the objection of being irrelevant and immaterial. The best evidence rule had no application to the witness' testimony that the permit was back-dated. The rule requiring the production of original writings applies only where the purpose of the evidence offered is to prove the contents of the document. See McCormick and Ray, Texas Law of Evidence, 2nd Ed., sec. 1566. The testimony as to back-dating of the permit only related to when the permit was granted and not to the contents of the instrument.

We find no error in the action of the court in permitting

the state to offer evidence, including a journal entry from the records of ICT Corporation as State's Exhibit No. 5, for the purpose of showing a loss of over $1,000,000.00 to ICT Corporation as a result of its contract of exchange with Jack Cage & Company under date of July 1, 1956. Appellant had sought to show that under the exchange contract the $100,000.00 disbursement to Missouri Union Corporation was fully paid and settled. Art. 728, V.A.C.C.P., provides that when part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other. Appellant, having offered evidence to show that the $100,000.00 was paid and settled in the transaction, authorized the state to offer evidence to show not only that the $100,000.00 was not paid in the transaction but that the corporation lost over $1,000,000.00. State's Exhibit No. 5 was sufficiently identified as the official records of ICT Corporation by its secretary, Knoll, to authorize its admission in evidence. Art. 3737, V.A.R.C.S. Amberson v. Wilkerson, Texas Civ. App., 285 S.W. 2d 420.

We overrule appellant's contention that the court committed reversible error in failing to require the state, in advance of trial, to list or inform the appellant of the names of the witnesses upon which the indictment was found. The record reflects that on October 11, 1957, appellant filed a motion to require the state to list on the indictment the names of the witnesses or furnish same to him and on October 14, 1957, action on the motion was deferred by the court until October 21, 1957, the date the case was set for trial. On October 21, 1957, appellant was furnished with a list of the witnesses by the state after the parties announced ready for trial and no witnesses were called by the state who were not named on the list presented to appellant. The provision of Art. 392, V.A.C.C.P. that the attorney representing the state shall endorse on the indictment the names of the witnesses upon whose testimony the same was found has been held directory and not mandatory. Walker v. State, 19 Texas App. 176; Pruett v. State, 114 Texas Cr. Rep. 44, 24 S.W. 2d 41; Easterwood v. State, 132 Texas Cr. Rep. 9, 101 S.W. 2d 576 and Jackson v. State, 143 Texas Cr. Rep. 9, 101 S.W. 2d 921. No injury to appellant is shown as a result of the court's action; hence, no reversible error appears. Ellisor v. State, 162 Texas Cr. Rep. 117, 282 S.W. 2d 393 and Newton v. State, 162 Texas Cr. Rep. 519, 287 S.W. 2d 179.

We find the evidence sufficient to support the verdict of the jury finding appellant guilty and overrule appellant's contention that the same is insufficient because of a variance between the

allegation in the indictment and the proof as to the name of the injured party. The indictment charged appellant with embezzlement of money from "ICT Corporation, Dallas, Texas, a Corporation." The charter and amendment thereto offered in evidence by the state showed that the name of the corporation was "ICT Corporation." Its principal place of business is shown as being in Dallas, Dallas County, Texas. Such proof was sufficient to support the allegations of the indictment and not in variance thereof, as the words "Dallas, Texas," in the allegation of the indictment clearly were descriptive of the location of ICT Corporation and not of its name.

The judgment is affirmed.

Opinion Approved by the Court.

DAVIDSON, Judge, (dissenting).

My brethren overrule appellant's motion for rehearing, without written opinion .

To that conclusion, as also the original affirmance of this case, I do not agree.

The jury found appellant guilty of the crime of embezzlement.

If that conclusion be wrong, the blame therefor must rest with the jury, for they and they alone were the exclusive judges of the facts proved and of the credibility of the witnesses. It was for the jury to apply the facts to the law as submitted to them by the trial court. The finding of the jury is of no force or effect if there be no facts to support it. The jury can not by its verdict make or supply the facts.

It is the duty of the courts—especially this court—to determine whether the facts authorize the jury's conclusion.

The question of paramount importance, then, is whether the facts warranted the jury's finding that appellant was guilty of embezzlement. Of necessity, it must be known what constitutes the crime of embezzlement and the essential elements threof. Art. 1534, P.C., furnishes the answer, and reads as follows:

"If any officer, agent, clerk, employe, or attorney at law or in fact, of any incorporated company or institution, or any clerk, agent, attorney at law or in fact, servant or employe of any

private person, copartnership or joint stock association, or any consignee or bailee of money or property, shall embezzle, fraudulently misapply or convert to his own use, without the consent of his principal or employer, any money or property of such principal or employer which may have come into his possession or be under his care by virtue of such office, agency or employment, he shall be punished in the same manner as if he had committed a theft of such money or property."

It is clear from that statute that there are four elements necessary to be established. These are:

(1)   that the accused was the agent of the corporation and, as such agent, was charged with the duty of receiving the money with which he was charged with embezzling

(2)   that the accused did receive the money;

(3)   that he received the money by virtue of his agency, and

(4)   that he embezzled and converted to his own use the money so received.

Such is the construction this court and its predecessors have placed upon the statute for nearly a hundred years. See Note 1 of Art. 1534, Vernon's P.C., for attesting authorities, including the case of Fellers v. State, 138 Texas Cr. Rep. 307, 136 S.W. 2d 217.

In the indictment the state charged that appellant was guilty of embezzlement under the following allegation that he

"* * * was an officer, to wit: president, agent, servant and employee of ICT Corporation, Dallas, Texas, a corporation duly incorporated under the laws of the State of Texas, and the said Ben Jack Cage did then and there fraudulently embezzle, misapply and convert to his own use, without the consent of the said ICT Corporation certain money belonging to the said ICT Corporation, Dallas, Texas, a corporation, to wit, one hundred thousand dollars which is of the aggregate value of over fifty dollars, which said *money had come into the possession of, and was then and there under the care of, the said Ben Jack Cage by virtue of such employment as such officer, agent, servant, and employee, as aforesaid * * *.*" (Emphasis, supplied.)

I have supplied the emphasis in order to call express attention to the fact that the instant indictment alleged the four elements heretofore set out and that the charge was the embezzlement of money.

There was no allegation in the indictment charging appellant with embezzling any property, stocks, credits, or bank balances belonging to the ICT Corporation.

Having based its case upon the charge of embezzling money, the state was of necessity required to prove that fact as alleged.

When the trial court, at the close of the evidence, came on to charge the jury and give them the law governing this case he recognized it was necessary, in order to convict, that the jury find the four elements above mentioned, and, in obedience thereto, instructed the jury that before they could or would be authorized to convict they were required to find from the evidence beyond a reasonable doubt

(1) that the defendant was the agent of the ICT Corporation, as alleged, and by the terms of his employment was charged with receiving the money from his principal;

(2) that he did so receive the money belonging to his principal;

(3) that he received it in the course of his employment; and

(4) that he embezzled, misapplied, or converted it to his own use without the consent of his principal or employer.

Note, again, the use of the word "money," which, as the trial court defined and told the jury.

"* * * includes, besides gold, silver, copper or other coins, bank bills, government notes *and* other circulating medium current as money."

Such is the statutory definition. Art. 1544, P.C.

Under that charge, the jury found appellant guilty of embezzlement, as charged in the indictment. The trial court approved that finding of the jury. My brethren likewise approve that finding.

With that conclusion I do not agree, and respectfully submit that the facts in evidence do not warrant such conclusion.

Here are the facts upon which this conviction rests:

According to the witness Knoll, appellant was vice-president of the ICT Corporation.

The ICT Corporation had an account with the Mercantile National Bank of Dallas, Texas. In order to draw funds upon that account the signature of at least two persons was required on the check. Appellant could act as one of those signers. He could not, upon his lone signature, draw upon those funds.

On the 15th day of June, 1955, the Missouri Union Corporation, a Missouri corporation domiciled at Kansas City, Missouri, drew a draft upon appellant, Ben Jack Cage, c/o Jack Cage & Co., for the sum of $100,000 through the Mercantile National Bank, Dallas, Texas. That draft arrived in due time at said bank, and on June 22, 1955, according to the testimony of the witness Knoll, secretary-treasurer of the ICT Corporation, he (Knoll) paid the draft by delivering to the Mercantile National Bank a check payable to the bank for $100,000 against the funds of the ICT Corporation in that bank, signed by him and one Don Buchholz.

Knoll said that his authority for issuing the check was given him by a person with whom he had a long distance telephone conversation and whom he identified as and whose voice he recognized as that of the appellant, who told him to pay the draft from the funds of the ICT Corporation.

Knoll entered the $100,000 item as and carried it upon the books of the ICT Corporation as an account receivable. He admitted that he drew the check solely because of the telephone conversation and that he consulted with no other official of the ICT Corporation relative thereto.

The $100,000 was remitted to the Missouri Union Corporation in Kansas City, Missouri, and was deposited to the credit of that corporation in a Kansas City bank.

It was this $100,000 that appellant was charged with embezzling and for which he has been convicted.

Welshans, president of the Missouri Union Corporation,

testified that for the $100,000 the Missouri Union Corporation issued 20,000 shares of its common stock to three individuals designated by the appellant. Those three persons did not testify in the case. Welshans testified that the transaction whereby the Missouri Union Corporation received the $100,000 was completed with the issuance of the stock.

The effect of Welshans' testimony was that the Missouri Union Corporation sold the 20,000 shares of stock for the $100,000.

At this point in the development of the state's case the testimony takes two divergent trends. I am unable to ascertain therefrom whether the state is contending that appellant converted the 20,000 shares of stock to his own use or whether the state is contending that appellant converted $96,000 of the $100,000 from the Missouri Union Corporation. Whether one contention is tenable as against the other is immaterial, for the proof fails to establish either.

Looking, first, to what happened to the $100,000 after it went into the bank account of the Missouri Union Corporation in the State of Missouri:

According to the witness Welshans, about three days after the money reached the bank appellant withdrew the sum of $96,000 therefrom, by check, in the name of the Missouri Union Corporation, signed by him.

Appellant was a director and chairman of the board of the Missouri Union Corporation, which fact is difficult to understand in view of Welshans' testimony that appellant never owned a share of stock in the Missouri Union Corporation.

The cancelled $96,000 check is not a part of this record. The evidence shows that it was payable to the Oxford Corporation, a Nevada corporation.

On January 27, 1956, or about six months after the above transaction and after appellant had severed his connection with the ICT Corporation—which the witness Knoll testified occurred about thirty days prior to January 27, 1956, and which was over a year before this prosecution was instituted — the Oxford Corporation paid the Missouri Union Corporation $98,268, which represented the principal sum of $96,000 and $2,268 in addition.

Here is the way Welshans described the transaction:

"Actually, Missouri Union Corporation as a corporate entity bowed out of that transaction, if you use that term, on January 27, 1956, when it drew a draft in the amount of ninety-eight thousand, two hundred and sixty-eight dollars on the Oxford Corporation through Manufacturer's Trust Company in New York City."

So a year before this prosecution was instituted, the Missouri Union Corporation had the $100,000 it originally received and $2,268 profit.

Surely it can not be said that appellant converted the $100,000 or any part thereof. Yet that is the offense for which he stands convicted.

Now what happened to the 20,000 shares of stock?

On February 1, 1956, after the payment of the $98,268 above mentioned, the Oxford Corporation executed a note in the sum of $100,000, payable to the Missouri Union Finance Company, due on demand or six months thereafter.

The Missouri Union Finance Company was a subsidiary of the Missouri Union Corporation. It was not the Missouri Union Corporation. It was a different corporation.

To secure the payment of that note the appellant pledged the 20,000 shares of stock which the Missouri Union Corporation had originally issued. Whether appellant was the owner of the stock the record does not show, nor is there any evidence that at the time he executed the collateral pledge agreement he was the owner of the shares of stock or that they had been endorsed to him.

The Oxford Corporation made two $20,000 payments, or a total of $40,000, on that $100,000 note to the Missouri Union Finance Company, within a period of two or three months.

Approximately a year thereafter, the Missouri Union Finance Company settled, discharged, and cancelled the Oxford Corporation note by accepting the 20,000 shares, which had been pledged to secure the payment of the note, and by paying $30,000 in cash to the Oxford Corporation. Thus, for the $100,-000 represented in the note of the Oxford Corporation to the

Missouri Union Finance Company, that company realized $10,000 in cash and the 20,000 shares of stock in the Missouri Union Corporation.

The 20,000 shares of stock thereby went into the possession of the Missouri Union Finance Company, intact and as originally issued by the Missouri Union Corporation.

Appellant got none of that stock. As heretofore stated, Welshans testified that

"* * * there never was a share of the stock in this [Missouri Union] Corporation issued to Ben Jack Cage."

Some four days after the Missouri Union Finance Company acquired the 20,000 shares of stock, or on July 1, 1956, the ICT Corporation and the Jack Cage Company, a Texas corporation, entered into and executed a sales or exchange agreement whereby the ICT Corporation did "quit claim unto Jack Cage and Company all of ICT Corporation's rights, titles, interests, claims and demands in and to the following described properties * * *."

Among the properties described are the following:

"All of the claims, rights and choses in action of ICT Corporation against Missouri Union Corporation, a Missouri corporation, for the 100,000 [sic] paid or advanced to Missouri Union Corporation by ICT Corporation on or about June 22, 1955."

In return, Jack Cage and Company transferred to the ICT Corporation certain properties listed in the agreement.

That agreement was executed in the name of the ICT Corporation by J. A. McFaddin, president, and attested by Marie Myers, secretary-treasurer, and was put in evidence by the state.

The instrument speaks for itself. No signer thereto or any one officially connected with the ICT Corporation challenged its correctness or that the ICT Corporation was not fully paid or compensated for its $100,000 by the property it received in exchange therefor.

The indictment in this case was returned and filed on May 29, 1957, which was approximately eleven months after the ICT Corporation had transferred by quitclaim to another cor-

poration all its interest in the $100,000 it had paid to the Missouri Union Corporation.

The testimony regarding that transaction therefore shows that the ICT Corporation was fully compensated, long before this prosecution was instituted, for the $100,000 it had advanced to the Missouri Union Corporation and that the Missouri Union Corporation owed it nothing when this prosecution was instituted.

That evidence tends strongly to show that the ICT Corporation parted with its $100,000 to the Missouri Union Corporation voluntarily and that neither appellant nor anyone else embezzled that money from the ICT Corporation.

The most significant feature of that testimony, however, is that it shows consent on the part of the ICT Corporation to the transaction rather than that the $100,000 was paid to the Missouri Union Corporation without its consent.

The foregoing are the facts upon which this conviction rests.

In analyzing and applying these facts to this conviction it is vastly more important to notice the absence of evidence than to note what was proven.

At the outset, let it be understood that I am not passing upon whether the appellant is guilty of stealing from the ICT Corporation or its stockholders, or whether he is guilty of wrecking that corporation, or whether he is a thief or criminal, generally, and ought to be sent to the penitentiary on general principles.

The only matter before this court is whether the facts here presented show that appellant is guilty of embezzling $100,000 in money from the ICT Corporation and converting it to his own use, and that is all I am passing on.

As I have pointed out, it was necessary for the state to prove that the vice-president of the ICT Corporation was charged with the duty of receiving money for and on behalf of the ICT Corporation.

There is not a line of evidence here that shows what the duties of the vice-president of the ICT Corporation were or

that it was the duty of the vice-president to receive money in behalf of that corporation.

Yet that is the first essential element of the offense of embezzlement that the state was required to show. This it has wholly failed to do.

The state was also and in addition required to prove the second and third essentials heretofore set out, which are that this appellant did receive the $100,000 here involved, by virtue of the fact that he was vice-president of the ICT Corporation. There is not a line of testimony in this case that so shows. All the facts are to the exact contrary.

The $100,000 was in the actual possession of the Mercantile National Bank. It was in the constructive possession only of those persons who were authorized to exercise control over and to check it out of the bank. Appellant was not authorized to draw a check against that money, either individually or as vice-president of the corporation. The fact that it was necessary for appellant to call upon Knoll and Buchholz to sign the check shows that he could not do so. If appellant had been in either the actual or the constructive possession of the money, he could have exercised that possession and checked out the money.

But mere possession of the $100,000 is not sufficient to show embezzlement. The state was required to show that the $100,000 came into the possession of the appellant as vice-president of the corporation, under the duty imposed upon that officer to receive it. There is not a line of testimony that so shows.

No officer of the bank or any other person testified as to the source of the $100,000 which was in the bank. All that the testimony shows is that there was in the bank to the credit of the ICT Corporation that amount of money.

There is an utter lack of evidence that appellant ever at any time had possession of the $100,000 in the bank or that he received it as vice-president of the ICT Corporation or that any duty was imposed upon the office of vice-president to receive the money.

It is, to me, inconceivable to say that the state has here met the burden of establishing by the evidence the first three of the four elements of the crime of embezzlement heretofore set out. But for the sake of argument, let it be said that if the state

did establish those three elements, the completed crime of embezzlement still has not been shown or established.

There remains to be established the fourth essential element, which is that appellant embezzled and converted to his own use the $100,000 in money. There is not a line of evidence in this case that the appellant converted that sum of money to his own use.

Conversion of the property by the accused to his own use must be shown in order for the crime of embezzlement to exist. Lawshe v. State, 57 Texas Cr. Rep. 32, 121 S.W. 865; Sherman v. State, 124 Texas Cr. Rep. 205, 61 S.W. 2d 488.

Here is the law as expressed in 18 Am. Jur., Embezzlement, Sec. 12, page 577:

"The principle is well established that an essential element of embezzlement is the conversion of the property lawfully in the possession of the accused. If the property is in the actual or constructive possession of the owner, the offense is larceny. * * * Generally, it may be said that mere custody of property as distinguished from possession does not suffice to support an accusation of embezzlement. * * * The reason for this rule is that if a person gains possession of property so as to constitute only a bare charge or custody, such custody does not divest the possession from the true owner and the appropriation of the property under such circumstances amounts to larceny, and not embezzlement."

The case of Smith v. State, 53 Texas Cr. Rep. 117, 109 S.W. 118, is cited as supporting the last statement.

The common law of larceny is the same as "theft" under Texas law.

The indictment in this case, in obedience to that requirement, alleged that appellant did, in Dallas County, Texas, "fraudulently embezzle, misapply and convert to his own use" the $100,000.

Under that allegation, the state was under the burden of showing that appellant converted, in Dallas County, Texas, the $100,000 to his own use.

There is not a line of testimony that appellant converted to

his own use that sum of money or any part thereof. How could he have converted it to his own use when all the evidence shows that the Missouri Union Corporation received that sum of money and, so far as this record is concerned, still has it? Moreover, under the testimony that appellant never owned any stock in the Missouri Union Corporation he could not have even indirectly benefited therefrom.

So the state has utterly failed to prove conversion of the $100,000 as it alleged and charged. But, here again let it be said for the sake of argument that if some time during the trial the state did prove that the appellant converted to his own use the money or the shares of stock purchased therewith or that he received some benefit therefrom, such by no means proves embezzlement.

If everything else I have referred to heretofore were excluded from this record or treated as having been proven, yet there remains one insurmountable obstacle to a conviction in this case which the state can not and does not attempt to overcome or explain.

I call attention to the fact that if there be any evidence of conversion in this case, such occurred only within the State of Missouri and not in the State of Texas.

All the evidence, however, tending to show conversion by appellant of the $100,000, or the stock of the Missouri Union Corporation issued thereafter, occurred in the State of Missouri. If appellant converted any part of the money to his own use, such conversion occurred in the State of Missouri and not in Texas. If the conversion of the $100,000 by appellant was consummated by the issuance of the stock of the Missouri Union Corporation, such occurred entirely within the State of Missouri and not within the State of Texas.

This question as to where any conversion took place is not one of venue, because venue presupposes that an offense has been proven. To the contrary, the question is one of jurisdiction and, until proven, no offense has been shown to have been committed in this state of which the courts of Texas would have jurisdiction.

The jurisdiction of the trial court to find this appellant guilty of the offense of embezzlement has not been shown, nor

has the offense of embezzlement by appellant been shown to have occurred within the State of Texas.

Under this record, the undisputed facts, and the law, appellant has not been proved guilty of the offense of embezzlement.

In order that by remaining silent I may not be cast in the position of agreeing to the admissibility of the sixteen checks whereby the funds of the ICT Corporation were paid to J. B. Saunders, I have only to say that there was no issue under the facts of this case which authorized the admission of those checks in evidence.

This admission in evidence violated that rule which says that extraneous offenses and transactions are admissible in evidence only when some issue is presented under the facts of the case as to intent, motive, identity, or system of the accused.

My views upon that question will be found in the dissenting opinion in the case of Parnell v. State, 166 Texas Cr. Rep. 239, 312 S.W. 2d 506.

I am not blind to or unmindful of the fact that the conclusions I have here expressed, to the effect that appellant has not been tried and convicted in accordance with law and that his guilt has not been established by legal and competent evidence, are contrary to the adverse critcism and publicity and notoriety given to this case and this appellant.

It is my duty to decide this case solely under the written law of this state and under the facts and the record here presented and to recognize nothing else. This I have done.

It was Mr. Justice Holmes of the Supreme Court of the United States—whom Mr. Justice Frankfurter, in Craig v. Harney, 91 L. Ed. 1546, at p. 1560, referred to as "an Olympian who was so remote from the common currents of life that he did not read newspapers"—who once said, in referring to our system of justice, in the case of Patterson v. Colorado, 205 U.S. (at page 462), 51 L. Ed. 881, 27 Sup. Ct. 556:

"* * * that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print."

It was Mr. Justice Black who said, in the case of Bridges v. California, 314 U.S. 252, 86 L. Ed. 192, 62 Sup. Ct. 190:

"Legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper."

I respectfully enter my dissent to the affirmance of the instant case.